232

national government in any emergency to depart from its constitutional function and invade the reserved power of the states. Mr. Justice Davis, speaking for the Supreme Court in the case of Ex parte Milligan, 4 Wall. 2, 18 L. Ed. 281, made the following announcement, which, in so far as I am advised, has never been questioned by any court in the land:

"The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, and under all circumstances. No doctrine, involving more pernicious consequences, was ever invented by the wit of man than that any of its provisions can be suspended during any of the great exigencies of government. Such a doctrine leads directly to anarchy or despotism, but the theory of necessity on which it is based is false; for the government, within the Constitution, has all the powers granted to it, which are necessary to preserve its existence." Ex parte Milligan, 4 Wall. 2 at pages 120 and 121, 18 L. Ed. 281.

I am not unmindful that Congress at its recent session found not only the United States, but the whole world, to be in a deplorable condition, nor do I criticize the noble motive prompting Congress and the President to attempt to relieve this condition, but I cannot conceive of any emergency, especially in the time of peace, which would authorize Congress to ignore the Constitution and enact measures tending to regulate purely local business within the several states. Article 6, clause 2, of the Constitution, provides: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

Every judge of the United States and of the several states is required, upon entering upon the discharge of his duties, to take an oath to support and defend the Constitution of the United States. I have held several offices under the United States, and have been admitted to the courts of several states, to several of the courts of the United States, including the Supreme Court of the United States, and upon each occasion took an oath to support the Constitution of the United States. For some reason this oath, solemn as it was, never impressed me with half the

force as the oath which I took in the presence of my family and members of the bar upon assuming the duties of United States District Judge, and I then rededicated the remainder of my life to an attempt to uphold this Constitution, and with that oath before me I must hold that Congress had no authority to attempt to regulate purely intrastate business.

[4] I must deny the restraining order for another reason. Clause (c), section 3, of the National Industrial Recovery Act, 15 USCA § 703 (c), provides: "The several district courts of the United States are hereby invested with jurisdiction to prevent and restrain violations of any code of fair competition approved under this chapter; and it shall be the duty of the several district attorneys of the United States, in their respective districts, under the direction of the Attorney General, to institute proceedings in equity to prevent and restrain such violations."

This clause, in my opinion, contemplates that actions to restrain violations of the National Industrial Recovery Act should be brought by the United States acting through its district attorneys and not by any individual members of an industry, and the district attorney is not movant here, but persons engaged in the same industry are complainants, and I do not believe they have any standing in court to ask for an injunction under the National Industrial Recovery Act.

**In re HESS.**
**No. 21171.**

District Court, E. D. New York.
Dec. 2, 1933.

Alfred C. B. McNevin, of New York City, for bankrupt.

Edwin C. Morsch, of Brooklyn, N. Y., for Charles L. Auer, objecting creditor.

BYERS, District Judge.

This is a motion by the bankrupt for an order "disapproving and disaffirming" the report of the referee to whom specifications in opposition to discharge were duly referred. The specifications are, the making of a false oath by failing to include in his schedules, among his assets, an interest in the respective estates of his deceased parents; and in having transferred or concealed, within twelve months, a one-fourth interest in a certain mortgage representing a portion of the personalty in his father's estate.

The referee has reported against discharge, and in effect finds as follows: "After hearing the testimony of the bankrupt and other witnesses I am satisfied that at the time of the bankruptcy the bankrupt had an interest in the estates of Louis Hess, his father, and Bertha F. W. Hess, his mother. The schedules fail to disclose such interest."

The reference to an interest in the mother's estate was inadvertent because that was confined to real estate in Bronxville and, having been listed in the schedules, so much of the specification as dealt therewith was withdrawn.

The facts with reference to the bankrupt's interest in his father's estate have been permitted to become somewhat confused.

Apparently the bankrupt and his brother were the executors of their father's will, and held a $5,000.00 mortgage which they assigned on October 6, 1931, purporting to have received $5,000.00 consideration therefor from one Annie F. Larkin.

This was about eight days prior to the filing of the voluntary petition, and is discussed by the objecting creditor as the transfer upon which the specification was based. It is urged that it was particularly obnoxious, as being in defiance of a stay contained in an order for examination in supplementary proceedings obtained in the State Supreme Court by the objecting creditor.

Possibly sight has been lost of the fiduciary capacity in which the executors acted in making that assignment, which is to be distinguished from the personal status of the bankrupt which may have been involved in what was done as the result of the conversion of the mortgage into cash through the medium of the assignment.

The individual property of the bankrupt included his distributive share in his father's estate, receivable by him from the executors of his father's will.

The nature and extent of that property would be shown as the result of a proceeding judicially to settle the accounts of the executors, in the Surrogate's Court in which the father's will was probated. No such settlement has been had. An involuntary accounting proceeding was initiated by the trustee in bankruptcy, which did not result in a decree, but in the filing of an affidavit, apparently intended for verification on May 16, 1932, which is said to have been the basis of a release executed by all beneficiaries, namely, the two sisters of this bankrupt and his brother and co-executor.

Such a release may have operated to adjust the accounts of the executors so far as the other beneficiaries are concerned, and therefore to have satisfied the Surrogate concerning the administration of the estate; but it could not operate to fix the extent of the bankrupt's inheritance from his father, or so as to be conclusive upon a creditor of the bankrupt as to the actual distribution made to him, by the executors, at or prior to the time of filing the petition.

It may be assumed that it was this aspect of the matter that led to the conclusion of the referee quoted above. This is another way of saying that the bankrupt was shown to have had an interest in the estate of his deceased father, who died February 25, 1930, and whose will was admitted to probate on March 19, 1930; the only evidence as to what became of that interest is the testimony of an

attorney by the name of Walsh, that on October 6, 1931, he had no beneficial interest in the assets of the decedent, which was of course an opinion or a conclusion; and the bankrupt's testimony that, when these schedules were filed, he had received some $700.00 in excess of what his sisters and brother had received, and that he then received no part of the proceeds said to have been realized on the fortuitous sale or assignment by the executors of this $5,000.00 mortgage.

These assertions do not constitute legal proof that the bankrupt had no interest in his father's estate when he filed his petition, and, as he made no reference thereto in his schedules, the conclusion of the referee seems to be justified.

It would seem fair, however, to afford to the bankrupt an opportunity to establish, by legal proof, the true facts as they existed at the date of his petition. To do this, he will be required to show the equivalent of what would be necessary upon a judicial settlement of the executors' accounts, namely, the debits and credits of the executors. The latter of course involves the exact details of such distribution as has been made to the legatees under the will.

In order to save time and effort upon the part of the referee, perhaps a statement of the accounts can be agreed upon by the attorneys for the bankrupt and the objecting creditor. In any event, the expense involved by such further hearing, if one is desired, should be borne by the bankrupt.

The motion to disapprove the referee's report will be denied, with leave to the bankrupt to resubmit the proceeding to the referee for the purpose indicated, the cost of the minutes to be payable by the bankrupt, for which indemnity may be required by the referee.

Settle order.

## HIRSCHFELD v. NOGLE.

### No. 610.

District Court, E. D. Illinois.

Nov. 29, 1933.

Albert Tuxhorn, of Champaign, Ill., for complainant.

Little & Finfrock, of Urbana, Ill., for respondent.

LINDLEY, District Judge.

The bankrupt filed her voluntary petition on August 23, 1932, and was adjudged a bankrupt on September 2, 1932. The plaintiff, her duly appointed trustee in bankruptcy, sues to recover an alleged preference.

On March 8, 1930, the bankrupt executed in favor of defendant a chattel mortgage for a good consideration, which was duly acknowledged and recorded and became due March 7, 1932, and was never extended. About August 15, 1932, just prior to the filing of the petition in bankruptcy, the mortgagee took possession of the mortgaged chattels and advertised the same for sale, selling same the day after the petition in bankruptcy was filed, on the 24th day of August, 1932.

Under the statute of Illinois, this chattel mortgage was a valid lien from the time it was filed for record until 90 days after maturity. After the expiration of such period, it was no longer valid as against execution